[ORAL ARGUMENT NOT YET SCHEDULED]

# 24-2648(L)

24-2705(XAP)

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellant-Cross-Appellee,

*v.*

RIPPLE LABS, INC.,

Defendant-Appellee-Cross-Appellant,

BRADLEY GARLINGHOUSE, CHRISTIAN A. LARSEN,

Defendants-Appellees.

---

On Appeal from a final order of the U.S. District Court
for the Southern District of New York Case No. 1:20-cv-10832 (Torres, J.)

---

## BRIEF AMICUS CURIAE OF BETTER MARKETS, INC., BY CONSENT, IN SUPPORT OF THE SECURITIES AND EXCHANGE COMMISSION AND REVERSAL IN PART

---

Jim Davy

Stephen W. Hall
Brady C. Williams

ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
215-792-3579
jimdavy@allriselaw.org
Counsel of Record

Better Markets, Inc.
2000 Pennsylvania Ave., NW
Suite 4008
Washington, DC  20006
(202) 549-3382
shall@bettermarkets.org
bwilliams@bettermarkets.org
Counsel for Amicus Curiae

January 22, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29 of the Federal Rules of Appellate Procedure ("FRAP"), Better Markets, Inc. ("Better Markets") states that it has no parent company and that there is no publicly held company that has any ownership interest in Better Markets.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT…………………………………… iii

TABLE OF CONTENTS…………………………………………………………… iv

TABLE OF AUTHORITIES……………………………………………………... vi

IDENTITY AND INTEREST OF THE AMICUS CURIAE…………………….... 1

SUMMARY OF ARGUMENT................................................................................. 3

ARGUMENT............................................................................................................. 5

    I. XRP cryptocurrency offerings are investment contract securities, and investors' acquisition of those securities on trading platforms does not alter their character as such…………………………………………………… 5

        A. Investors acquiring their tokens on platforms clearly satisfied Howey's third prong....................................................................... 6

        B. The district court's distinction finds no support in the statutory definitions of a security.................................................................. 7

        C. The district court's decision conflicts with the Supreme Court's definition of an investment contract in Howey............................... 8

        D. The district court's decision starkly conflicts with the decisions of numerous other courts that have addressed the same issue............ 10

    II. The district court ignored the economic realities surrounding the offer and sale of Ripple's XRP token and the ability of investors to comprehend the link between Ripple's efforts and the promise of profit.............................12

        A. The district court did not make a realistic or accurate appraisal of today's investors........................................................................... 14

        B. Ripple targeted retail investors and capitalized on their willingness to expect profits from Ripple's efforts.......................................... 16

III. The district court failed to consider the harm that investors will suffer if crypto securities traded on platforms are exempted from securities regulation.................................................................................. 17

    A. The district court's decision has the perverse effect of protecting institutional investors but not retail investors................................. 19

    B. Crypto investment offerings continue to grow, with heavy participation by retail investors....................................................... 21

    C. Crypto security offerings continue to be marked by volatility and illegal practices that inflict large losses on investors...................... 23

CONCLUSION.…………………………………………………………….. 29

# TABLE OF AUTHORITIES

## CASES

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (2019)............................................8

*Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023) .........................12

*Harper v. O'Neal*, No. 23-21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024) ................................................................................................................................11

*In re Ripple Labs, Inc. Litig.*, No. 18-CV-06753-PJH, 2024 WL 3074379 (N.D. Cal. June 20, 2024)..............................................................................................17

*Reves v. Ernst & Young*, 494 U.S. 56 (1990)...............................................................9

*SEC v. Binance Holdings Ltd.*, No. CV 23-1599 (ABJ), 2024 WL 3225974 (D.D.C. June 28, 2024) ........................................................................................................12

*SEC v. Binance*, No. 1:23-cv-01599 (D.D.C. June 5, 2023) ....................................26

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ........................................13

*SEC v. Celsius Network Limited,* No. 1:23-CV-6005 (S.D.N.Y. Nov. 1, 2023).....24

*SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260 (2024)...................................8, 11, 20

*SEC v. Edwards*, 540 U.S. 389 (2004) ......................................................................28

*SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. 2022)........................................12

*SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (2023) .................................passim

*SEC v. Ripple Labs, Inc.*, No. 1:20-CV-10832-AT-SN, 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) ..............................................................................................22

*SEC v. Samuel Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y. filed Dec. 13, 2022) 26

*SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020)........................12

*SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170 (S.D.N.Y. 2023) ......8, 10, 25

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ....................................................passim

*SEC v. Wahi*, No. 2:22-CV-01009-TL, 2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ......................................................................................................................11

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) .............................................12

## STATUTES

15 U.S.C. § 77b ............................................................................................................7

15 U.S.C. § 77e ............................................................................................................8

15 U.S.C. § 78c ............................................................................................................7

**OTHER AUTHORITIES**

Ahmed Ishtiaque, *Crypto Degen Says Holding 10,000 XRP Is the Key to Unlocking Financial Freedom*, BRAVE NEW COIN (Jan. 20, 2025).........................................21

Alex Wickham, Jennifer Jacobs, & Alberto Nardelli, *US and UK Probe $20 Billion of Crypto Transfers to Russian Exchange*, BLOOMBERG (Mar. 28, 2024) ...........27

*Amount of Bitcoin and Ether on Exchanges Reach Record Multi-Year Lows*, UNCHAINED (June 3, 2024)..................................................................................22

Ari Levy & MacKenzie Sigalos, *Crypto peaked a year ago — investors have lost more than $2 trillion since*, CNBC (Nov. 11, 2022) ............................................27

Aru Bhat & Sofia Eckrich, *Are 'finfluencers' the future of financial advice?*, WORLD ECON. FORUM (July 17, 2024) ...................................15

Better Markets, *Crypto 101: Bait-and-Switch, False Promises, Influence Peddling and a Growing Threat to our Financial System and Main Street* (Nov. 14, 2024) ...............................................................................................................................27

Casia Thompson, *Blog: Crypto Fraud Costs Investors $5 billion*, AMER. FOR FIN. REFORM (Jan. 7, 2025) .......................................................................................25

Chris Brummer & Yesha Yadav, *Fintech and the Innovation Trilemma*, 107 GEO. L. J. 235 (2019).........................................................................................................7

*CoinGecko*, XRP ..............................................................................................................21

CoinMarketCap, *Today's Cryptocurrency Prices by Market Cap*....................21, 27

CoinMarketCap, *Top Cryptocurrency Spot Exchanges*...........................................21

Coryanne Hicks, *Different Types of Cryptocurrencies*, FORBES ADVISOR (MAR. 15, 2023) ..................................................................................................................20

Deloitte, *Market Manipulation in Digital Assets* (Mar. 2021) ................................23

Dennis M. Kelleher, Jason Grimes, & Andres Chovil, *Securities—Democratizing Equity Markets With And Without Exploitation: Robinhood, Gamestop, Hedge Funds, Gamification, High Frequency Trading, And More*, 44 W. NEW ENG. L. REV. 51 (2022) ...............................................................................................15

Edwin Hu, *SEC v. Ripple: Everyone Loses*, THE CLS BLUE SKY BLOG: COLUMBIA LAW SCHOOL'S BLOG ON CORPORATIONS AND THE CAPITAL MARKETS (July 18, 2023) ..................................................................................................................19

Eswar Prasad, *The Brutal Truth About Bitcoin*, N.Y. TIMES (June 14, 2021) .........27

FEDERAL BUREAU OF INVESTIGATION, CRYPTOCURRENCY FRAUD REPORT 5 (Sept. 9, 2024) ..................................................................................................................24

Federal Bureau of Investigation, *Internet Crime Complaint Center Releases 2022 Statistics* (Mar. 22, 2023) .....................................................................................24

Gary Gensler, *Remarks Before the Aspen Security Forum* (Aug. 3, 2021) ............23

Giulio Cornelli *et al.*, *Crypto shocks and retail losses*, Bank for International Settlements: BIS Bulletin No. 69 (20 Feb. 2023) .................................................27

Guenole Le Pennec, Ingo Fiedler, & Lennart Ante, *Wash Trading at Cryptocurrency Exchanges*, SCIENCEDIRECT (Nov. 2021) ...................................23

Harris Fischman *et al.*, *SEC Enforcement: 2023 Year in Review*, HARV. L. SCH. F. CORP. GOVERNANCE (Mar. 13, 2024) ..................................................................25

https://www.x.com/Ripple .....................................................................................16

Ilya Beylin, *Ripping the Ripple Opinion*, THE CLS BLUE SKY BLOG: COLUMBIA LAW SCHOOL'S BLOG ON CORPORATIONS AND THE CAPITAL MARKETS (July 18, 2023) ......................................................................................................................14

Jacob G. Stanley, *A Disruptive Ripple in the SEC's Regulation of Crypto Assets*, 28 N.C. BANKING INST. 467 (2024).............................................................................19

Javier Paz, *More than Half of All Bitcoin Trades Are Fake*, FORBES (Aug. 26, 2022) .................................................................................................................................23

John Livingstone, Anat Alon-Beck, & Nizan Packin, *The Ripple and Terraform Cases Tee Up a Dramatic Showdown over Cryptocurrency Regulation*, THE CLS BLUE SKY BLOG: COLUMBIA LAW SCHOOL'S BLOG ON CORPORATIONS AND THE CAPITAL MARKETS (Aug. 14, 2023) ..................................................................28

Lin William Cong *et al.*, *Crypto Wash Trading*, NATIONAL BUREAU OF ECONOMIC RESEARCH (Dec. 2022)..........................................................................................23

Lin William Cong, Xi Li, Ke Tang, & Yang Yang, *Crypto Wash Trading* (Aug. 2023) ......................................................................................................................23

LiveCoinWatch, *Cryptocurrency Market Overview*................................................21

Markus Münster *et al.*, *Robinhood, Reddit, and the news: The impact of traditional and social media on retail investor trading*, 71 J. FIN. MKTS. 1 (2024) .............14

Miles Brooks, *6 Crypto-Friendly States 2025 (Expert Verified)*, COINLEDGER......22

Miranda Reiter *et al.*, *Who Uses Social Media for Investment Advice*, FIN. PLANNING ASS'N (Sept. 2023)..............................................................................15

Murray L. Simpson, *Investors' Civil Remedies under the Federal Securities Laws*, 12 DEPAUL L. REV. 71 (1962).............................................................................20

Press Release, Department of Justice, *Justice Department Announces First Directors of National Cryptocurrency Enforcement Team* (Feb. 17, 2022).........24

Press Release, Securities and Exchange Comm'n, *SEC Charges Terraform and CEO Do Kwon with Defrauding Investors in Crypto Schemes*...........................26

Press Release, Securities and Exchange Comm'n, *Terraform and Kwon to Pay $4.5 Billion Following Fraud Verdict* (June 13, 2024) .................................................26

Press Release, U.S. Attorney's Office, Southern District of New York, *Celsius Founder and Former CEO Alexander Mashinsky Pleads Guilty to Multi-Billion Dollar Fraud and Market Manipulation Schemes* (Dec. 3, 2024) .....................25

Reddit.com ...........................................................................................................16

SEC, *Securities Topics: Crypto Assets* .................................................................25

SEC, STAFF REPORT ON EQUITY AND OPTIONS MARKET STRUCTURE CONDITIONS IN EARLY 2021 (Oct. 14, 2021) ........................................................................15, 16

SEC, *The Laws That Govern the Securities Industry* ..............................................20

Shama Hyder, *How Social Media is Helping Cryptocurrency Flourish: A Case Study with Jonathan Jadali*, FORBES (Aug 2021) .................................................16

*Standing with Crypto Means Standing with Fraudsters*, BETTER MARKETS (Sept. 18, 2024) ...........................................................................................................26

TRM LABS, ILLICIT CRYPTO ECOSYSTEM REPORT (June 2023) .........................23, 24

*XRP Nears Historic Highs: Over 23% of Supply Held by Just 11 Exchanges*, PUBLIC.COM (Jan. 16, 2025) ..............................................................................21

YouTube Playlist, *The Ripple Drop* ......................................................................16

## IDENTITY AND INTEREST OF THE AMICUS CURIAE

Better Markets[1] is a nonprofit, nonpartisan organization that promotes the public interest in the financial markets through comment letters on proposed rules, independent research, amicus curiae briefs, public advocacy, and Congressional testimony. It advocates for reforms that stabilize our financial system; protect investors from fraud and abuse; and make all of our financial markets more fair, transparent, and efficient. Better Markets has filed hundreds of comment letters on proposed rules with the financial regulators, including the Securities and Exchange Commission ("SEC"), and dozens of amicus briefs in the federal courts supporting strong regulation and enforcement to protect investors and safeguard the integrity and vitality of our financial markets. *See generally* www.bettermarkets.org.

Better Markets has a strong interest in this case. The district court dramatically narrowed the definition of an "investment contract," removing a vast

---

[1] In accordance with FRAP 29(a)(4)(E), Better Markets certifies that (i) no counsel for any party authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person—other than Better Markets, its members (of which there are none), or its counsel—contributed money that was intended to fund preparing or submitting this brief. In accordance with FRAP 29(a)(2), undersigned counsel for Better Markets states that all parties (Securities and Exchange Commission; Ripple Labs, Inc.; Bradley Garlinghouse; and Christian A. Larsen) have consented to the filing of this brief.

1

number of cryptocurrency offerings and potentially many other investments from the reach of the securities laws. It did so based on how investors acquire those securities and on investors' level of sophistication. Yet neither of these criteria that the district court grafted onto the investment contract definition has any basis in law or fact.

Unless this Court reverses the district court on these issues, a huge number of everyday American investors will be far more vulnerable to fraud and abuse in the rapidly expanding and extraordinarily risky market for cryptocurrency investments. That includes any investors—retail or institutional—who acquire crypto investments through secondary trading platforms, where a large volume of crypto security trading occurs. The court's decision also endangers less sophisticated investors who are deemed incapable of understanding crypto issuers' promotional claims—a result fundamentally inconsistent with the investor protection purposes at the heart of the securities laws.

Without jurisdiction over these types of securities, the SEC will lose its ability to protect these two classes of investors—those who trade on exchanges and those who lack sophistication—from the widespread predations in the crypto securities markets. And the harm posed by the court's decision is likely to extend well beyond the realm of crypto, as a wide variety of investment contracts based on other types of assets stand to evade securities regulation simply by virtue of the channels through

which they are sold to investors and investors' level of sophistication. The threat to investors is enormous, and Better Markets is therefore urging this Court, on legal and policy grounds, to reverse the especially consequential and legally erroneous aspects of the district court's decision.

## SUMMARY OF ARGUMENT

The XRP tokens sold by Ripple Labs, Inc. ("Ripple") are investment contract securities regardless of whether investors acquired them directly from Ripple or indirectly on secondary trading platforms. And they are investment contracts regardless of the purchasers' level of sophistication. In all cases, investors were led to expect profits from the efforts of others, thus satisfying the third prong of the *Howey* test for investment contracts. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The district court's decision to the contrary, *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (2023) ("Op."), was wrong for three reasons.

First, the court erred in holding that investment contract status hinges on an investor's purchase of the investment directly from the issuer. This position finds no support in the securities laws; it disregards the Supreme Court's firmly established axioms calling for a broad, flexible, and realistic application of *Howey*; and it starkly deviates from the growing body of modern case law appropriately finding that crypto offerings are investment contracts regardless of whether they are sold directly to investors or through secondary trading platforms.

3

Second, the court erred in concluding that retail investors were not sophisticated enough to grasp the link between their expected profits and Ripple's claimed efforts to find valuable commercial applications for its token. As a threshold matter, investor sophistication is not an element of the *Howey* test, and if it were, it would clearly militate *in favor* of investment contract status so investors most in need of protection would be safeguarded. In any event, the court offered no basis for its conjecture, and the court's estimation of investor sophistication actually conflicts with the economic realities surrounding today's retail investors. They are bombarded with online promotions that clearly tout issuers' ability to pursue business strategies and applications that will generate huge profits for investors. Ripple took full advantage of this in its widespread appeal to retail investors.

Finally, the court erred by applying *Howey* in a way that will dramatically undermine the investor protection purposes of the securities laws. It thus violated the cardinal rule embodied in *Howey*: "The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae." *Howey,* 328 U.S. at 301. The unfortunate reality is that the court's decision deprives millions of retail investors of critical protections under the securities laws in an investment arena where they need it most, one that is rapidly expanding yet rife with fraud and abuse. Countless everyday investors, enticed by earnest sales pitches but deprived of full and accurate disclosures and meaningful remedies, will suffer

financial losses. And the harm is likely to spread to investment offerings well beyond crypto, limited only by the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey,* 328 U.S. at 299.

## **ARGUMENT**

I. **Ripple's XRP cryptocurrency offerings are investment contract securities, and investors' acquisition of those securities on trading platforms does not alter their character as such.**

The district court correctly held that the XRP tokens Ripple sold *directly* to institutional investors comfortably satisfied all three of the elements in the *Howey* test for investment contracts and were therefore securities. Op. at 324–28. However, the district court also held that Ripple's sale of the same tokens to retail and other investors through various trading platforms—sales that actually netted Ripple $757 million—were *not* investment contracts because the third prong of *Howey* was, in the court's view, not satisfied. The court based its decision on the non sequitur that to the extent investors were not buying directly from Ripple, they could not be said to expect profits from the efforts of others. Op. at 328–30.

The court's ruling on the status of these secondary sales or "Programmatic" transactions under *Howey* was erroneous. A straightforward application of *Howey* to the court's own findings clearly shows that Ripple's investors were led to expect profits derived from the efforts of Ripple and its principals. The district court's

5

distinction based on the identity of the seller has no bearing on investor expectations and it finds no support in logic or the law.

**A.** **Investors acquiring their tokens on platforms clearly satisfied** ***Howey's*** **third prong.**

The application of *Howey* in this case leads easily to the conclusion that those members of the public who invested in XRP tokens via trading platforms satisfied the third prong of the investment contract test: Regardless of who they purchased from, they had a reasonable expectation of profit from the broadly touted efforts of Ripple and its principals to increase the demand for XRP and its price by 1) finding commercial uses for XRP and 2) creating a liquid secondary market for the token.

This follows from the long list of promotional materials and strategies Ripple used to entice investors of all stripes, which the court itself catalogued. Op. at 326–27. Ripple conducted a sales campaign through a wide variety of primers, brochures, market reports, public interviews, press conferences, and social media platforms including Reddit, YouTube, and XRPChat. Most were publicly disseminated or publicly available. In those materials, Ripple's "senior leaders" touted their "amazing team" and their efforts to find uses for XRP, burnish the "ecosystem," and add the "most value to the protocol." Op. at 326–27. Applying an objective test to these facts, it is only reasonable to conclude that investors expected to profit from XRP as a result of "the efforts of others," regardless of the particular channel through

which they acquired their XRP tokens.  As explained below, the district court's contrary finding has no basis.

### B. The district court's distinction finds no support in the statutory definitions of a security.

As a threshold matter, nothing in the statutory definitions of a security suggests that the anonymous nature of platform or exchange trading somehow undermines the essential nature of a security.  *See* 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).  Congress compiled a long list of over two dozen items that constitute securities to ensure that investors were broadly protected.  And it adopted the investment contract definition to serve as a catchall term that could encompass a myriad of investment offerings that might be engineered to circumvent regulation as securities.[2]

Nothing in those definitions carves out investment contracts that are traded on exchanges or platforms or those where the issuer is not the seller.  On the contrary, extensive secondary trading on national exchanges is characteristic of the vast majority of registered securities.  As one court addressing the central issue presented in this case has explained,

---

[2] *See* Chris Brummer & Yesha Yadav, *Fintech and the Innovation Trilemma*, 107 GEO. L. J. 235, 238 (2019) (explaining that the *Howey* test is the "long-established yardstick for determining whether a non-conventional financial product is a security").

the text of the federal securities laws does not distinguish the nature of the instrument based on its manner of sale. . . . Consequently, the applicability of the federal securities laws should not be—and indeed, as to more traditional securities, is not—limited to primary market transactions.

*SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 294 (2024); *see also Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356 n.14 (2019) ("Purchasers' ability to resell ATB Coins on other exchanges also supports the conclusion that the coins are securities. . . . The Chairman of the SEC has identified the ability to trade on a secondary market as a "key hallmark[ ] of a security."); *cf.* 15 U.S.C. § 77e(a) (prohibiting unregistered offers and sales made "directly or indirectly").

### C. The district court's decision conflicts with the Supreme Court's definition of an investment contract in *Howey*.

The district court's analysis also conflicts with the extensive Supreme Court jurisprudence governing the application of *Howey*. *Howey* itself certainly does not draw a distinction in the way investors acquire their investment contract securities. *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 197 (S.D.N.Y. 2023) ("the Court declines to draw a distinction [where] coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not" because "*Howey* makes no such distinction"); *see also Coinbase*, 726 F. Supp. 3d at 293 (explaining that "*Howey* does not recognize such a distinction as a necessary element in its test of whether a transaction

constitutes an investment contract, nor have courts, in the nearly eighty years of applying *Howey*, read such an element into the test.").

On the contrary, the Supreme Court has taken pains to make clear that the application of *Howey* must be broad and flexible, not constrained by unrealistic formulae. *See Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress . . . . enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment."); *Howey*, 328 U.S. at 299, 301 (the investment contract definition was intended by Congress to be broad, embodying a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," which is not to be "thwarted by unrealistic and irrelevant formulae").

While the district court recited these familiar principles, it did not adhere to them in its analysis of the Programmatic Sales to retail investors. Instead, it fashioned a narrow, technical, and inflexible rule that the third prong of *Howey* cannot be met unless the investor purchases directly from—and knows they are purchasing directly from—the issuer. That's not what Congress or the Supreme Court intended.

**D. The district court's decision starkly conflicts with the decisions of numerous other courts that have addressed the same issue.**

Finally, the district court's decision stands as an outlier among cases addressing the status of crypto securities offerings under *Howey*. For example, in *SEC v. Terraform Labs PTE, LTD*., 684 F. Supp. 3d 170 (2023), the court expressly rejected the district court's distinction based on the way investors acquired their XRP tokens:

> [T]he Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case. [citing *Ripple*]

The court explained the illogic in excluding crypto securities acquired on secondary trading platforms from the *Howey* test:

> That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts. . . . [T]he defendants embarked on a public campaign to encourage both retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial and technical skills that would allow the defendants to maximize returns on the investors' coins. . . . These representations would presumably have reached individuals who purchased their crypto-assets on secondary markets— and, indeed, motivated those purchases—as much as it did institutional investors. Simply put, secondary-market purchasers had every bit as good a reason to believe that the defendants would take their capital contributions and use it to generate profits on their behalf.

*Id.* at 197–98.

10

In *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 293 (2024), the court similarly rejected the defendants' attempt to evade *Howey* based on the way investors acquired their crypto securities:

> [T]here is little logic to the distinction Defendants attempt to draw between the reasonable expectations of investors who buy directly from an issuer and those who buy on the secondary market. An investor selecting an investment opportunity in either setting is attracted by the promises and offers made by issuers to the investing public. Accordingly, the manner of sale "has no impact on whether a reasonable individual would objectively view the [issuers'] actions and statements as evincing a promise of profits based on their efforts." *Terraform* I, 684 F. Supp. 3d at 197.

Many other courts have adopted the same view. *See, e.g.*, *Harper v. O'Neal*, No. 23-21912-CIV, 2024 WL 3845444, at *10 (S.D. Fla. Aug. 16, 2024) (rejecting the district court's analysis and stating that "whether a purchaser bought directly or instead in a secondary resale transaction has no impact on whether a reasonable individual would objectively view a defendant's actions and statements as evincing a promise of profits based on their efforts"); *SEC v. Wahi*, No. 2:22-CV-01009-TL, 2024 WL 896148, at *6 (W.D. Wash. Mar. 1, 2024) ("The promotional statements and managerial promises set forth in the FAC apply equally to tokens that an investor may have bought from the issuer directly or from another investor, including on a crypto asset trading platform. Each issuer continued to make such representations regarding the profitability of their tokens even as the tokens were traded on secondary markets."); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 215–20 (D.N.H.

2022) (holding that the LBC token was a security because LBRY's representations led to a reasonable expectation of profit, regardless of whether investors were purchasing directly or indirectly from LBRY); *SEC v. Telegram Grp. Inc*., 448 F. Supp. 3d 352, 358, 379 (S.D.N.Y. 2020) (finding the initial sale and subsequent resale of tokens to be securities). *But see SEC v. Binance Holdings Ltd.*, No. CV 23-1599 (ABJ), 2024 WL 3225974, at *19–22 (D.D.C. June 28, 2024) (holding not all secondary sales of BNB involved securities, based on pleading deficiencies). The district court's decision thus conflicts with the vast majority of court decisions addressing the issue.

## II. __The district court ignored the economic realities surrounding the offer and sale of Ripple's XRP token and the ability of investors to comprehend the link between Ripple's efforts and the promise of profit.__

Notwithstanding the overwhelming evidence that Ripple sought to entice investors with promises that it would work assiduously to increase the value of XRP, the district court rested on the bald assertion that investors were more likely to be seeking to profit from "general cryptocurrency market trends."[3]  Op. at 329.  The court further decided that retail investors acquiring XRP through Programmatic

---

[3] The district court's analysis on this point is also in tension with this Circuit's flexible interpretation of the third *Howey* prong, under which investor expectations of profit need not be based *solely* on the efforts of others.  *See  Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 442–43  (S.D.N.Y. 2023) (citing *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008)).

.

Sales lacked the sophistication to "parse through" Ripple's many promotional materials and glean their essentially simple thrust—namely, that through Ripple's efforts, the value of XRP would rise and investors would profit handsomely. Op. at 330.

This approach suffers from multiple flaws. First, investor sophistication is not an element of the *Howey* test, and if it were, it would clearly militate *in favor* of a finding that such investors were purchasing investment contracts, in keeping with the investor protection goals underlying the investment contract definition. Second, the district court's holding establishes an inappropriately subjective test, requiring courts to fathom the level of investors' sophistication. This fundamentally unworkable approach conflicts with the Supreme Court's long-standing principle that investment contracts are to be evaluated according to an objective test, based on what investors were reasonably led to believe as a result of an issuer's promotions. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (courts look to the "economic inducements held out" in promotional materials, and an issuer's offerings are "judged as being what they were represented to be").

Finally, the district court offered no basis for its disparaging assessment of retail investors' ability to grasp Ripple's core sales pitch. In reality, and unfortunately, many retail investors are eminently capable of understanding and believing the frequent claims in the crypto world that promoters will find valuable

uses for their tokens, leading to huge investor profits. The district court's assessment thus also conflicts with the Supreme Court's admonition that courts should focus on the economic realities accompanying an investment offering. *Howey*, 328 U.S. at 298 (form should be "disregarded for substance and the emphasis should be on economic reality").

## A.   The district court did not make a realistic or accurate appraisal of today's investors.

The district court's dim view of retail investors ignores modern day economic realities. It incorrectly assumes that the average retail investor is incapable of understanding the hypes and promises that lead investors to eagerly expect profits from the efforts of others.[4] This view is unfounded, and it ignores the level of interest and access to investment offerings of all sorts that motivate today's retail investors.

Many retail investors are exposed to new investment offerings and trends through social media platforms that promoters increasingly rely on to attract investors' funds. In fact, social media is becoming a significant source of

---

[4] This aspect of the court's ruling has drawn harsh criticism. One securities law scholar has observed that the *Ripple* decision was "bonkers," as its "logic deprives ordinary investors of the protection of securities laws . . . because of [their] asserted inability to understand how Ripple contributed to the appreciation of the XRP token." *See* Ilya Beylin, *Ripping the Ripple Opinion*, THE CLS BLUE SKY BLOG: COLUMBIA LAW SCHOOL'S BLOG ON CORPORATIONS AND THE CAPITAL MARKETS (July 18, 2023), https://clsbluesky.law.columbia.edu/2023/07/18/ripping-the-ripple-opinion/.

information for retail investors.[5] Over 60% of U.S. investors under 35 use it as an important source of investment information.[6] This trend affords unscrupulous actors, including many crypto securities promoters, broad exposure to groups of investors who are especially vulnerable to slick sales pitches, gamification tactics, and promises of profits that are often delivered through easily accessible mobile platforms.[7]

The GameStop ("GME") short squeeze in 2021 demonstrated the power of social media to attract and catalyze retail investment decisions and trends—often contrary to what is in their best financial interest.[8] The price movements of GME coincided with substantial interest expressed in online forums such as YouTube and

---

[5] *See* Markus Münster *et al.*, *Robinhood, Reddit, and the news: The impact of traditional and social media on retail investor trading*, 71 J. FIN. MKTS. 1, 2 (2024) (finding that "Reddit posts have a significant impact on investors that is significantly greater than that of conventional news articles").

[6] Aru Bhat & Sofia Eckrich, *Are 'finfluencers' the future of financial advice?*, WORLD ECON. FORUM (July 17, 2024), https://www.weforum.org/stories/2024/07/finfluencer-financial-advice-social-media/; Miranda Reiter *et al.*, *Who Uses Social Media for Investment Advice*, FIN. PLANNING ASS'N (Sept. 2023), https://www.financialplanningassociation.org/learning/publications/journal/SEP23-who-uses-social-media-investment-advice-OPEN.

[7] Dennis M. Kelleher, Jason Grimes, & Andres Chovil, *Securities—Democratizing Equity Markets With And Without Exploitation: Robinhood, Gamestop, Hedge Funds, Gamification, High Frequency Trading, And More*, 44 W. NEW ENG. L. REV. 51 (2022), https://digitalcommons.law.wne.edu/lawreview/vol44/iss1/4.

[8] SEC, STAFF REPORT ON EQUITY AND OPTIONS MARKET STRUCTURE CONDITIONS IN EARLY 2021, at 17 (Oct. 14, 2021), https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.

Reddit.[9] And the discussions on these forums were not simply cheerleading based on price trajectory; they concerned issues such as GME's fundamental analysis, the high short float, and the ability of the company to transition into e-commerce and thus become more profitable.[10] The internet and social media platforms are now a primary source that many investors turn to for substantive knowledge about investment offerings.

**B.    Ripple targeted retail investors and capitalized on their willingness to expect profits from Ripple's efforts.**

Ripple certainly seized on these trends with its aggressive cross-platform social media campaign clearly aimed at retail investors. In 2021, Facebook, Twitter (now X), and Reddit were cited as popular conveyors of crypto information.[11] Ripple was a major actor here, as it shared its crypto content with its nearly 1 million Twitter followers.[12] Today, its account has 2.9 million followers.[13] And its YouTube channel

---

[9] *Id.*

[10] *Id.*

[11] Shama Hyder, *How Social Media is Helping Cryptocurrency Flourish: A Case Study with Jonathan Jadali*, FORBES (Aug 2021), https://www.forbes.com/sites/shamahyder/2020/11/23/how-social-media-is-helping-cryptocurrency-flourish/.

[12] *Id.*

[13] https://www.x.com/Ripple (last visited Jan. 17, 2025).

carries a show called "The Ripple Drop."[14] Similarly, the gaming chat platform Discord hosts Ripple-dedicated chatrooms.[15]

At least one court has focused specifically on this aspect of Ripple's promotions, describing Reddit posts from Ripple employees, "Reddit Ask Me Anything" interviews with employees, and publicly disseminated statements touting Ripple's efforts in the development of cross-border payment systems as a commercial application for the token. *In re Ripple Labs, Inc. Litig.*, No. 18-CV-06753-PJH, 2024 WL 3074379, at *9 (N.D. Cal. June 20, 2024). It is only reasonable to conclude that these aggressive promotions would have induced investors to believe they would profit from the efforts of Ripple to enhance the value of XRP, regardless of whether their direct seller was Ripple or another trader on a platform.

## III. **The district court failed to consider the harm that investors will suffer if crypto securities traded on platforms are exempted from securities regulation.**

As a general proposition, remedial statutes such as the securities laws are to be interpreted broadly by courts to achieve their purposes. That's certainly true here, and a court's obligation to consider the impact of its decision on investors is even

---

[14] YouTube Playlist, *The Ripple Drop*, https://youtube.com/playlist?list=PLl-QsmXvjodqrlcbMri1joAq7_FNCZoF1&si=x_smM6pMlY_Mq5Oi
[15] *E.g.*, Reddit.com, *07/07/24 [Join XRPLounge Discord]*, https://www.reddit.com/r/Ripple/comments/1dx7oh1/070724_join_xrplounge_discord/ (last visited Jan. 17, 2025).

greater where Congress and the Supreme Court have established a test specifically designed to protect investors by casting a broad net over what counts as a security. That's precisely what the investment contract definition, as applied by *Howey* and its progeny, have done. As the Supreme Court has repeatedly explained, the *Howey* test was intended to effectuate "[t]he statutory policy of affording broad protection to investors." *Howey*, 328 U.S. at 301.

Although the district court also acknowledged this guiding principle, Op. at 323, it failed to consider the ways in which its narrow application of *Howey* would significantly *undermine* investor protection. Nowhere in the district court's decision is there any consideration of the need to protect the many retail investors who invested in XRP via Programmatic Sales. Nor is there any appreciation of the far-reaching harm that the court's holding is likely to have as the crypto craze continues to unfold, other crypto promoters take advantage of the district court's loopholes, and countless investors suffer as the protections of the securities laws are shorn away. The threat is increasingly intense because while the court's decision protects institutional investors, it leaves retail investors—those most heavily targeted and vulnerable—to fend for themselves. Moreover, crypto investments are expanding, along with the fraud and abuse often associated with them.

**A.    The district court's decision has the perverse effect of protecting institutional investors but not retail investors.**

The district court's ruling on the Programmatic Sales deprives ordinary retail investors of the protections of the securities laws where they are needed most, since, by the court's own reckoning, those investors are incapable of fathoming Ripple's sales pitches and are therefore especially vulnerable to sheer hype.  Yet ironically, it protects sophisticated institutional investors who presumably are better-equipped to evaluate the investments, protect themselves, and even interact with Ripple and obtain whatever information they deem necessary.

For this reason, a number of securities law experts have leveled especially strong criticisms at the court's decision.  As one scholar has explained:

> In contrast, *Ripple Labs* strayed from *Howey* by creating a differentiated taxonomy of protection based on a judicial assessment of investor sophistication. In extending protection to hedge funds and high-net-worth individuals but denying it to everyday investors, *Ripple Labs* did a disservice to the purpose of the securities laws—to make securities markets safe and fair for ordinary investors by mandating disclosure and imposing liability for non-compliance. . . .  If other courts follow the *Ripple Labs* application of *Howey*, the SEC will have less power to vindicate the interests of small investors, while institutional investors with the money and power to gain direct access to crypto executives will enjoy a greater degree of safety. This would be an unjust outcome contrary to the spirit of the securities laws and seven decades of jurisprudence since *Howey*. . . . [I]f another crypto asset case comes before the Second Circuit, the appellate court should resist the upside-down reasoning of *Ripple Labs* and follow *Terraform Labs*'s proper application of *Howey*.

Jacob G. Stanley, *A Disruptive Ripple in the SEC's Regulation of Crypto Assets*, 28 N.C. BANKING INST. 467, 501–02 (2024) (emphasis added); *see also id.* at 478–79; Edwin Hu, *SEC v. Ripple: Everyone Loses*, THE CLS BLUE SKY BLOG: COLUMBIA LAW SCHOOL'S BLOG ON CORPORATIONS AND THE CAPITAL MARKETS (July 18, 2023), https://clsbluesky.law.columbia.edu/2023/07/18/sec-v-ripple-everyone-loses/ ("the opinion essentially holds that sophisticated institutions get the protections of the securities laws, while ordinary investors do not").

What investors lose under the district court's ruling is the extensive array of safeguards set forth in the securities statutes and regulations that not only protect investors from fraud and abuse but also provide them with meaningful remedies. *See Coinbase*, 726 F. Supp. 3d at 270 (describing the securities regulation framework).[16]   The threat posed by this regulatory vacuum on crypto security platforms is acute.  As shown below, crypto securities offerings are plentiful and growing; the crypto markets are rife with fraud, manipulation, and a lack of disclosure that takes a huge toll on investors; and there is no alternative regulatory regime that can compensate for the absence of securities regulation.

---

[16] *See generally* SEC, *The Laws That Govern the Securities Industry*, https://perma.cc/KL9E-CBB2; *see also* Murray L. Simpson, *Investors' Civil Remedies under the Federal Securities Laws*, 12 DEPAUL L. REV. 71 (1962).

**B.** **Crypto investment offerings continue to grow, with heavy participation by retail investors.**

Cryptocurrencies and the investment offerings on which they are based have experienced a meteoric rise. Since the initial appearance of crypto just over 15 years ago, the market has been flooded with tens of thousands of ledger-based cryptocurrency offerings. *See, e.g.*, *Coinbase*, 726 F. Supp. 3d at 272 (noting that as of March 2024, "there are over 25,000 digital assets in circulation"). Many if not most of these offerings are regarded as securities.[17] The infrastructure for these offerings includes at least 247 exchanges,[18] and that number continues to grow. Overall daily trading volume is on the order of $138.8 billion,[19] and Ripple's own 24-hour trading volume is approximately $8 billion.[20] Recently, the market cap of all cryptocurrencies reached a value of $3.68 trillion.[21]

The data also show that Ripple, like many issuers, relies heavily on retail investors. For example, about 95% of the wallets of XRP holders contain fewer than

---

[17] Coryanne Hicks, *Different Types of Cryptocurrencies*, FORBES ADVISOR (Mar. 15, 2023), https://tinyurl.com/2mlqpgax.

[18] CoinMarketCap, *Top Cryptocurrency Spot Exchanges*, https://coinmarketcap.com/rankings/exchanges/ (last visited Jan. 14, 2025) (non-decentralized exchanges allowing for the immediate purchase and sale of crypto currencies and crypto investments).

[19] LiveCoinWatch, *Cryptocurrency Market Overview*, https://www.livecoinwatch.com/crypto-market-cap (last visited Jan. 14, 2025).

[20] *CoinGecko*, XRP, https://www.coingecko.com/en/coins/xrp (last visited Jan. 14, 2025).

[21] CoinMarketCap, *Today's Cryptocurrency Prices by Market Cap*, https://coinmarketcap.com/ (last visited Jan. 20, 2025).

10,000 tokens, suggesting a large share of XRP holders are smaller, retail investors.[22] Moreover, 23% of the total supply of XRP is held by 11 exchanges.[23] This is significantly higher relative to coins such as Bitcoin and Ether, where exchanges collectively hold only 11.5% and 10.6% respectively of the total supply of those crypto currencies.[24] These numbers confirm that smaller retail investors, who rely on secondary markets, figure prominently in the XRP landscape.

Clearly, the increase in cryptocurrency schemes is likely to intensify if XRP and similar investment offerings are not regulated as securities. Moreover, if platform trading in crypto securities remains unregulated under the securities laws, then the U.S. is likely to become an even more attractive crypto haven.[25]

---

[22] Ahmed Ishtiaque, *Crypto Degen Says Holding 10,000 XRP Is the Key to Unlocking Financial Freedom*, BRAVE NEW COIN (Jan. 20, 2025), https://bravenewcoin.com/insights/crypto-degen-says-holding-10000-xrp-is-the-key-to-unlocking-financial-freedom?utm_source=chatgpt.com.

[23] *XRP Nears Historic Highs: Over 23% of Supply Held by Just 11 Exchanges*, PUBLIC.COM (Jan. 16, 2025), https://public.com/posts/xrp-nears-historic-highs-over-23-of-supply-held-by-just-11-exchanges-2358466651.

[24] *Amount of Bitcoin and Ether on Exchanges Reach Record Multi-Year Lows*, UNCHAINED (June 3, 2024), https://unchainedcrypto.com/amount-of-bitcoin-and-ether-on-exchanges-reach-record-multi-year-lows/

[25] *Cf.* Miles Brooks, *6 Crypto-Friendly States 2025 (Expert Verified)*, COINLEDGER, https://coinledger.io/blog/crypto-friendly-states (describing states that are friendly to crypto).

**C. Crypto security offerings continue to be marked by volatility and illegal practices that inflict large losses on investors.**

Along with their intense volatility, the cryptocurrency markets have been characterized by widespread illegality, including the failure to register the investments under the securities laws, as in this case. *See SEC v. Ripple Labs, Inc.*, No. 1:20-CV-10832-AT-SN, 2024 WL 3730403 at *9 (S.D.N.Y. Aug. 7, 2024) (order granting motion for final judgment enjoining Ripple from further violations of the securities laws based on its failure to register the crypto investment contracts sold to institutional investors and imposing a civil penalty of $125,035,150). Other common violations include wash trading,[26] fraud, manipulation,[27] and outright theft, with SEC Chairman Gary Gensler referring to the crypto markets as the "Wild West"[28] and "rife with fraud, scams, and abuse."[29] This is certainly true in the markets for the two most prominent cryptocurrencies, Bitcoin and Ether, where

---

[26] Lin William Cong *et al.*, *Crypto Wash Trading*, NAT'L BUREAU ECON. RSRCH. (Dec. 2022), https://www.nber.org/papers/w30783 ("We find that the wash trading volume, on average, is as high as 77.5% of the total trading volume on unregulated exchanges. . . . [T]hese estimates translate into wash trading of over 4.5 trillion USD in spot markets and over 1.5 Trillion in USD in derivatives markets in the first quarter of 2020 alone"); *see also* Javier Paz, *More than Half of All Bitcoin Trades Are Fake*, FORBES (Aug. 26, 2022), https://tinyurl.com/2grwpa46.

[27] *See Market Manipulation in Digital Assets*, DELOITTE (Mar. 2021) (estimating that up to 90% of the trading volume in cryptocurrency could be subject to manipulation including, but not limited to, pump-and-dump schemes, spoofing, and layering to wash sales), https://tinyurl.com/2krj5asb.

[28] Gary Gensler, Remarks Before the Aspen Security Forum (Aug. 3, 2021), https://tinyurl.com/2qt6ymme.

[29] *Id.*

studies indicate that "most of the reported trading volume" is attributable to wash trading."[30]

More broadly, illegal schemes involving cryptocurrencies have continued to proliferate with a heavy toll on investors. One report estimates that fraud schemes involving cryptocurrencies received over $9 billion in 2022 alone.[31] Of that amount, $7.8 billion involved pyramid or Ponzi schemes.[32] The FBI also estimates that investment fraud involving cryptocurrencies rose by nearly 200% from $907 million in 2021 to $2.57 billion in 2022.[33] In 2023, the FBI reported that it had received approximately 70,000 complaints related to cryptocurrencies, representing $5.5 billion in losses.[34] These schemes often involve the now-classic tactics designed to take investors' money while enriching the promotors: the sale of unregistered securities; the baseless promise of huge returns; phony trading to manipulate prices; and a failure to protect and segregate investor funds, sometimes leading to outright

---

[30] Guenole Le Pennec, Ingo Fiedler, & Lennart Ante, *Wash Trading at Cryptocurrency Exchanges*, SCIENCEDIRECT (Nov. 2021), https://tinyurl.com/2lcn5bgx; Lin William Cong, Xi Li, Ke Tang, & Yang Yang, *Crypto Wash Trading*, at 5, 7 (Aug. 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3530220.

[31] TRM LABS, ILLICIT CRYPTO ECOSYSTEM REPORT (June 2023), https://www.trmlabs.com/report.

[32] *Id.*

[33] *Id.*; Federal Bureau of Investigation, *Internet Crime Complaint Center Releases 2022 Statistics* (Mar. 22, 2023), https://tinyurl.com/27cfm9at.

[34] FEDERAL BUREAU OF INVESTIGATION, CRYPTOCURRENCY FRAUD REPORT 5 (Sept. 9, 2024), https://www.fbi.gov/news/press-releases/fbi-publishes-2023-cryptocurrency-fraud-report.

theft. The proliferation of cryptocurrency scams became so severe in recent years that the Department of Justice established a National Cryptocurrency Enforcement Team in February 2022.[35]

The recent Celsius fraud exemplifies the enormous risk associated with crypto investments. *See SEC v. Celsius Network Limited,* No. 1:23-CV-6005 (S.D.N.Y. Nov. 1, 2023). As a result of the CEO's failure to register tokens, misleading statements, and manipulation of the Celsius token, investors—including ordinary people saving for retirement and college educations—apparently lost more than $5 billion.[36] Mashinsky, the CEO, recently pled guilty to commodities and securities fraud.[37]

More generally, the SEC has for years been relentlessly bringing enforcement actions against firms and their principals who promote cryptocurrency securities, alleging not only the core failure to register offerings but also fraud, manipulation,

---

[35] Press Release, Department of Justice, *Justice Department Announces First Directors of National Cryptocurrency Enforcement Team* (Feb. 17, 2022), https://www.justice.gov/opa/pr/justice-department-announces-first-director-national-cryptocurrency-enforcement-team.

[36] Casia Thompson, *Blog: Crypto Fraud Costs Investors $5 billion*, AMER. FOR FIN. REFORM (Jan. 7, 2025), https://ourfinancialsecurity.org/2025/01/blog-another-crypto-fraudster-pleads-guilty-after-investors-lost-5-billion/.

[37] Press Release, U.S. Attorney's Office, Southern District of New York, *Celsius Founder and Former CEO Alexander Mashinsky Pleads Guilty to Multi-Billion Dollar Fraud and Market Manipulation Schemes* (Dec. 3, 2024), https://www.justice.gov/usao-sdny/pr/celsius-founder-and-former-ceo-alexander-mashinsky-pleads-guilty-multi-billion-dollar.

and other illegal activities in connection with their offer and sale.[38]  In 2023 alone, the SEC brought 46 cryptocurrency-related enforcement actions.[39]  A sampling of cases illustrates the pervasive illegal conduct on crypto platforms and the scale of harm.  *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.,* 708 F. Supp. 3d 450, 457 (S.D.N.Y. 2023) (multi-billion-dollar fraud involving the development, marketing, and sale of cryptocurrency securities, including false claims that a popular electronic mobile phone application used Terraform's blockchain, and leading to a jury verdict for securities fraud);[40] *SEC v. Samuel Bankman-Fried*, No. 22-cv-10501 (S.D.N.Y. filed Dec. 13, 2022)  (massive securities fraud by FTX founder involving billions of dollars in customer assets and leading to 25-year prison sentence); *SEC v. Binance*, No. 1:23-cv-01599 (D.D.C. filed June 5, 2023) (alleged sale of unregistered securities and fraud in the operation of world's largest crypto trading platform, with Binance and its principal pleading guilty to violations of banking laws).[41]

---

[38] For a list of crypto-related SEC enforcement actions, *see* SEC, *Securities Topics: Crypto Assets*, https://www.sec.gov/securities-topics/crypto-assets.

[39] Harris Fischman *et al.*, *SEC Enforcement: 2023 Year in Review*, HARV. L. SCH. F. CORP.  GOVERNANCE  (Mar.  13,  2024), https://corpgov.law.harvard.edu/2024/03/13/sec-enforcement-2023-year-in-review/.

[40] Press Release, Securities and Exchange Comm'n, *SEC Charges Terraform and CEO Do Kwon with Defrauding Investors in Crypto Schemes* (Feb. 16, 2023), https://www.sec.gov/newsroom/press-releases/2023-32;  Press Release, Securities and Exchange Comm'n, *Terraform and Kwon to Pay $4.5 Billion Following Fraud Verdict* (June 13, 2024), https://www.sec.gov/newsroom/press-releases/2024-73.

[41] Other recent enforcement actions brought by the SEC reinforce concerns about the widespread abuses in the market for cryptocurrency offerings, which target retail

Overhanging this pattern of illegal conduct in the crypto markets is the risk arising from their dangerous volatility. Because they have no inherent value, cryptocurrencies and the investment offerings on which they are based are extraordinarily volatile. Consequently, their market cap has swung wildly, at the expense of countless investors and even auguring potentially systemic instability across financial markets. In 2021, the cryptocurrency market cap reached highs of approximately $3 trillion dollars before plummeting back down to approximately $1 trillion in mid-2022, inflicting large-scale losses on many who invested.[42] Today, the valuations have recovered to a level of $3.68 trillion,[43] but they remain vulnerable to another dramatic downward spiral.

---

investors and at times minority communities. *See Standing with Crypto Means Standing with Fraudsters*, BETTER MARKETS (Sept. 18, 2024), https://bettermarkets.org/newsroom/fact-sheet-standing-with-crypto-means-standing-with-fraudsters/.

[42] Ari Levy & MacKenzie Sigalos, *Crypto peaked a year ago — investors have lost more than $2 trillion since*, CNBC (Nov. 11, 2022), https://www.cnbc.com/2022/11/11/crypto-peaked-in-nov-2021-investors-lost-more-than-2-trillion-since.html; Giulio Cornelli *et al.*, *Crypto shocks and retail losses*, Bank for International Settlements: BIS Bulletin No. 69 (20 Feb. 2023), https://www.bis.org/publ/bisbull69.pdf ("Data on major crypto trading platforms over August 2015–December 2022 show that . . . a majority of crypto app users in nearly all economies made losses on their [crypto] holdings.").

[43] CoinMarketCap, *Today's Cryptocurrency Prices by Market Cap*, https://coinmarketcap.com/ (last visited Jan. 20, 2025).

In an effort to counter this volatility, to enhance the value and appeal of their offerings, and to shed their reputation as favored tools of criminal enterprises,[44] crypto promoters have insisted that they can and will develop legitimate commercial uses for their currencies,[45] as Ripple has claimed in this case. That goal remains elusive, yet investors continue to be bombarded with promises that the crypto products underlying their investments will find valuable applications in finance, leading to huge profits on their crypto securities.

Without the disclosures and other safeguards required under the securities laws, backed by civil and criminal penalties, investors will remain largely at the mercy of these promoters. The harm can be expected to be even more far-reaching, extending to investors outside the realm of crypto, as the district court has created a loophole in the *Howey* test that applies broadly to all sorts of investment offerings. *Howey* and the cases applying it have already held a wide range of tangible and intangible assets to be the basis for investment contracts, from orange groves to

---

[44] Bitcoin rapidly evolved into "the preferred currency for criminal activities." Eswar Prasad, *The Brutal Truth About Bitcoin*, N.Y. TIMES (June 14, 2021), https://www.nytimes.com/2021/06/14/opinion/bitcoin-cryptocurrency-flaws.html. Crypto is the financial product of choice for many criminals worldwide, including blackmailers using ransomware, money launderers, sex traffickers, terrorists, drug dealers, rogue states, tax evaders, and many others. *See* Alex Wickham, Jennifer Jacobs, & Alberto Nardelli, *US and UK Probe $20 Billion of Crypto Transfers to Russian Exchange*, BLOOMBERG (Mar. 28, 2024), https://tinyurl.com/2l2hcuu8.
[45] Better Markets, *Crypto 101: Bait-and-Switch, False Promises, Influence Peddling and a Growing Threat to our Financial System and Main Street* (Nov. 14, 2024), https://tinyurl.com/2ydeflaz.

payphones, *SEC v. Edwards*, 540 U.S. 389 (2004). The district court's decision is thus likely to spawn new types of investment contract offerings in the crypto realm and beyond that are immune from securities regulation and that inflict yet further financial pain on investors. As one observer has explained:

> Unfortunately, the *Ripple* ruling opens the door to considerable mischief. It invites issuers to sell all sorts of things to potential retail investors by designing blind transactions, offering no disclosure, and avoiding securities laws. That is a dangerous precedent to set early in the debate over how to regulate cryptocurrencies.

John Livingstone, Anat Alon-Beck, & Nizan Packin, *The Ripple and Terraform Cases Tee Up a Dramatic Showdown over Cryptocurrency Regulation*, THE CLS BLUE SKY BLOG: COLUMBIA LAW SCHOOL'S BLOG ON CORPORATIONS AND THE CAPITAL MARKETS (Aug. 14, 2023), https://clsbluesky.law.columbia.edu/2023/08/14/the-ripple-and-terraform-cases-tee-up-a-dramatic-showdown-over-cryptocurrency-regulation/.

## CONCLUSION

For all of the foregoing reasons, the district court's judgment holding that the Programmatic Sales of Ripple's XRP token on secondary trading platforms are not securities under *Howey* should be reversed.

Dated: January 22, 2025                        Respectfully Submitted,

Better Markets, Inc.

Jim Davy

ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
215-792-3579
jimdavy@allriselaw.org
Counsel of Record


Stephen W. Hall
William C. Brady
Better Markets, Inc.
2000 Pennsylvania Ave., NW
Suite 4008
Washington, DC  20006
202-549-3382
shall@bettermarkets.org
bwilliams@bettermarkets.org

Counsel for Amicus Curiae Better
Markets, Inc.

## **CERTIFICATE OF COMPLIANCE**

In accordance with FRAP 29(a)(4)(G) and FRAP 32(g)(1), I hereby certify that the forgoing brief complies with the type-volume limit of FRAP 29(a)(5) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,851 words.

I further certify that this document also complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in 14-point Times New Roman font, a proportionately spaced, plain Roman typeface that includes serifs, using Microsoft Word for Office 365 MSO.

/s/ Jim Davy
Jim Davy

January 22, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2025, the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. Service was accomplished on counsel of record by the CM/ECF system.

/s/ Jim Davy
Jim Davy

Dated: January 22, 2025